IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| FIMCO, INC. d/b/a Ag Spray Equipment, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. CIV-16-1323-R ) |
| WOOTTON NEW HOLLAND, LLC, CAPITAL MACHINERY I CORP., DARRELL WOOTTON, DEREK WOOTTON, COREY ALDRIDGE, DALE CORNELIUS, JONATHAN CORNELIUS, AND SEAN RAIMBEAULT | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

# ORDER

Before the Court is Defendants' Motion to Dismiss claims against Capital Machinery I Corp. and Sean Raimbeault. (Doc. 17). For the reasons that follow, that Motion is DENIED.

## I. Background

This case concerns farming and agricultural equipment that Defendants bought from Plaintiff but allegedly never paid for. Plaintiff FIMCO, Inc. consists of two divisions. One of those divisions is Ag Spray, which offers a variety of lawn, garden, and agricultural products for wholesale to agricultural equipment dealers. One of those dealers, Defendant Wootton New Holland, LLC, (Wootton), purchased farm sprayers and other miscellaneous items from July 2015 to May 2016 for use at its various Oklahoma locations. These

1

purchases were made on credit from Ag Spray and subject to the agreement that Wootton would pay Ag Spray for the equipment and parts within a certain amount of time.[1] Wootton's alleged outstanding balance with Ag Spray stands at $237,773.63 today.

With Wootton refusing to pay any portion of the balance, even as the invoices piled up, its owners decided to yield control of the company's business operations. To that end, on December 26, 2015, it executed a Management Services Agreement with Defendant Capital Machinery, which bestowed on Capital the right to manage Wootton—everything from dictating operations and accounting to satisfying Wootton's outstanding obligations.[2] The Agreement also appointed Capital and its CEO, Sean Raimbeault, to be Wootton's "attorney-in-fact," thereby giving them the power to manage and sell Wootton's property. After the execution of the Management Agreement, Wootton continued to purchase equipment and parts on credit from Ag Spray, including almost $3,000 in equipment and $2,300 in parts.

So by January 2016, Capital was running Wootton per the Management Agreement. Yet Capital—at some unknown time in the summer of 2016—also made an ownership play, acquiring all issued and outstanding membership interest in Wootton. As of October 7, 2016, Capital, through its CEO Raimbeault, was portraying itself as the owner of

---

[1] To be precise, invoices offered by Ag Spray detail an accrual of invoices spanning from $34,947.88 for July 15, 2015 to amounts as small as $7.82 for May 4, 2016. The date payments were due for each invoice vary, but they range from November 6, 2015, to June 4, 2016. (Doc. 1, Ex. 2). The Court will "consider documents referred to in the complaint [because] the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

[2] Curiously, Capital was apparently not incorporated yet (that would happen two days later) and would not register to conduct business in Oklahoma until May 9, 2016.

Wootton. This seems to have begun as early as June 8, 2016, when Capital applied for a line of credit with Ag Spray. (Doc. 1, Ex. 2). Capital listed its address on the Business Credit Application as 402 N. 16th St. in Chickasha, Oklahoma—which just happens to be the address of one of Wootton's dealership locations. Further, Capital's listed store locations, bank reference, and trade reference also match those of Wootton's. Capital also represented it had been in business for nine years, despite having not been incorporated until December 28, 2015, and not registered to conduct business in Oklahoma until May 9, 2016. Also of note: the Application included Raimbeault's signature personally guaranteeing "the full and prompt payment of all liabilities, obligations, charges and dues of [Capital] to FIMCO." (Doc. 1, Ex. 2, at 3).

Ag Spray now demands that Wootton settle its nearly $238,000 account balance, or in the alternative, return the purchased equipment and parts, including the ten farm sprayers. Capital and Wootton, though, claim six of the sprayers are missing, possibly having been sold. In any event, Capital refuses to turn over any of the alleged sales proceeds or the remaining four sprayers in its possession. Ag Spray thus raises nine claims for relief against various Defendants. Capital and Raimbeault have moved to dismiss the causes of action against them.

## II. Standard of Review

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). "The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-

defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, a pleading must offer more than "labels and conclusions" and "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. There must be "sufficient factual matter, [which if] accepted as true . . . state[s] a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A plausible claim is one that "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plaintiff must "nudge[] his claims across the line from conceivable to plausible . . . ." *Twombly*, 550 U.S. at 570. Further, the Court "must accept all the well-pleaded allegations of the complaint . . . and must construe them in the light most favorable to the [non-moving party]." *Thomas v. Kaven*, 765 F.3d 1183, 1190 (10th Cir. 2014).

### III. Analysis

*A. The Claims for Unjust Enrichment and Conversion against Capital*

Ag Spray's first cause of action against Capital is for unjust enrichment on the basis that Capital has yet to pay any portion of Wootton's $237,773.63 balance on the Ag Spray account, continues to retain possession of four of the farm sprayers sold to Wootton, and has failed to account for the other six. These allegations are enough to state a claim for unjust enrichment, a claim for relief that arises where a "party has money in its hands that, in equity and good conscience, it should not be allowed to retain." *Harvell v. Goodyear Tire and Rubber Co.*, 167 P.3d 1028, 1035 (Okla. 2006). Why Ag Spray has stated a

plausible claim against Capital is straightforward: Capital, as the sole owner and operator of Wootton, will not turn over equipment and proceeds allegedly owed to Ag Spray.

Capital counters that because corporations are distinct legal entities, they are generally not responsible for the acts of another. Yet if Capital truly owns and manages Wootton—as Ag Spray alleges—then Wootton's obligations may be Capital's, thus giving rise to a plausible claim for unjust enrichment. And as for Capital's argument that it has not been unjustly enriched because it is not in control of any *profits* from the possible sale of the farm sprayers or other parts, that misstates the law: if the equipment purchased by Wootton is still in its possession without having been paid for, that alone bestows a benefit on Capital that is sufficient to state a plausible claim for unjust enrichment. *See, e.g., Branch v. Mobil Oil Corp.*, 778 F.Supp. 35, 36 (W.D. Okla. 1991) (denying motion to dismiss unjust enrichment claim because it could be inferred that defendants' use of plaintiffs' property to dispose of pollutants [thus] saved the expenses" that Defendant otherwise would have incurred).

Further, these same facts and allegations serve as the basis—and state a plausible claim—against Capital for Ag Spray's third cause of action: conversion, simply the interference of another person's right to possess the property in question. *White v. Webber-Workman Co.*, 591 P.2d 348, 350 (Okla. Civ. App. 1979). If Capital is currently in control of the equipment allegedly owed to Ag Spray, that gives rise to a plausible claim.

B. *The Claim for Fraudulent Transfer against Capital*

Capital has also moved to dismiss Ag Spray's claim for fraudulent transfer. Oklahoma's Fraudulent Transfer Act [3] "allow[s] a creditor the opportunity to invalidate the transfer of assets made by a debtor if the transfer has the effect of placing assets out of reach of present and future creditors." *Burrows v. Burrows*, 886 P.2d 984, 988 (Okla. 1994). Ag Spray alleges that Capital was in control of Wootton when it sold six of Wootton's ten sprayers and that Wootton neither paid for the sprayers nor remitted any of the proceeds to Ag Spray after the alleged sales. Capital, relying on the heightened pleading standard for fraud under Federal Rule of Civil Procedure 9(b)[4], argues that Ag Spray's claim fails because it has not "state[d] with particularity the circumstances constituting fraud or mistake," particularly details explaining *when* the sprayers were sold to determine if Capital was in control of Wootton at that time.

The Court disagrees; the claim is at least plausible. Ag Spray has alleged that Wootton purchased its last sprayer on March 17, 2015. Payment was due on April 17, 2016. Capital gained management control over Capital before this, on December 26, 2015. There was thus a substantial period following the Management Agreement when Capital could have orchestrated the sale of the sprayers, making this enough to state a plausible claim for fraudulent transfer. That Ag Spray, who is no longer in control of the sprayers, does not know when they were transferred out of Wootton's and Capital's possession seems excusable: "In determining whether a plaintiff has satisfied 9(b), courts may consider

---

[3] Okla. Stat. Ann. tit. 24, § 112.
[4] "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b).

whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control." *George v. Urban Settlement Services*, 833 F. 3d 1242, 1255 (10th Cir. 2016). Only Wootton and Capital can know if and when the sprayers were sold. Ag Spray's failure to plead as much with certainty is not fatal. Defendants' motion to dismiss the fraudulent transfer claim is therefore denied.

C. *Claims Against Capital Seeking to Pierce Wootton's Corporate Veil*

Ag Spray's fifth and sixth causes of action seek to pierce Wootton's corporate veil and hold Capital liable for Wootton's obligations, albeit on slightly different theories. Though courts are typically loath to pierce the corporate veil because corporations are distinct legal entities, "[c]ourts may disregard the corporate entity and hold stockholders personally liable for corporate obligations or corporate conduct under the legal doctrines of fraud, alter ego and when necessary to protect the rights of third persons and accomplish justice." *Estrada v. Kriz*, 345 P.3d 403, 409 (Okla. Civ. App. 2015).

Ag Spray's first theory seeks to pierce Wootton's corporate veil and hold Capital, Wootton's controlling shareholder, liable for the alleged fraudulent statements made by Wootton that it would later pay Ag Spray for the equipment and parts. The initial question is whether there was fraud. Elements of fraud include a "1) false material representation, 2) made as a positive assertion which is either known to be false or is made recklessly without knowledge of the truth, 3) with the intention that it be acted upon, and 4) which is relied on by the other party to his or her own detriment." *Id.* at 408. As previously explained, Ag Spray alleges that Capital, while in control of Wootton, made representations to Ag Spray that Wootton would pay Ag Spray the remaining account balance; that these

7

statements were made knowing that Wootton, and by extension Capital, never intended to pay the account balance and were made with the intention that Ag Spray would wait to settle the account balance; and that Capital actually intended to sell the purchased farm sprayers and pocket the proceeds. Given the allegation that Capital was firmly in control of Wootton during many of its representations that it would eventually settle the account balance, Ag Spray's complaint at least gives rise to a plausible claim seeking to pierce Wootton's corporate veil based on fraud.

Ag Spray's sixth cause of action is slightly different. Invoking an alter ego theory, Ag Spray attempts to piece the corporate veil to hold Capital liable for obligations and conduct of Wootton. Unlike its fifth cause of action, this claim does not require Ag Spray to prove fraudulent intent. *See id*. at 409 ("It is not necessary for fraudulent intent to be present for the alter ego theory to be applied to pierce the corporate veil.") (citing *Pennmark Res. Co. v. Okla. Corp. Comm'n*, 6 P.3d 1076, 1081 (Okla Civ. App. 2015)). Rather, "[t]he question [of] whether an allegedly dominant corporation may be held liable for a subservient entity's tort hinges primarily on *control*." *Frazier v. Bryan Mem'l Hosp. Auth.*, 775 P.2d 281, 288 (Okla. 1989) (emphasis in original). Under Oklahoma law, courts may evaluate the *Frazier* factors in assessing the level of control.[5] Ag Spray's Complaint

---

[5] "Factors which may be considered at trial include whether 1) the parent corporation owns all or most of the subsidiary's stock, 2) the corporations have common directors or officers, 3) the parent provides financing to its subsidiary, 4) the dominant corporation subscribes to all the other's stock, 5) the subordinate corporation is grossly undercapitalized, 6) the parent pays the salaries, expenses or losses of the subsidiary, 7) almost all of the subsidiary's business is with the parent or the assets of the former were conveyed from the latter, 8) the parent refers to its subsidiary as a division or department, 9) the subsidiary's officers or directors follow directions from the parent corporation and 10) legal formalities for keeping the entities separate and independent are observed." *Id*.

suggests many of those factors are present here. Applying the *Frazier* factors, the allegations suggest that "[Capital] owns all . . . of [Wootton's] stock;" that "[Capital] subscribes to all [Wootton's] stock;" that "[Wootton and Capital] have common directors or officers;" that "[Wootton] is grossly undercapitalized;" and that "[Wootton's] officers or directors follow directions from [Capital]." *Id.* In brief, these allegations are enough to state a claim under an alter ego theory.

D. *The Claim for Civil Conspiracy Against Capital and Raimbeault*

Ag Spray's seventh cause of action for civil conspiracy alleges that Raimbeault and Capital, along with Wootton, developed a scheme in which Wootton and Capital used false representations to induce Ag Spray to continue selling equipment and parts on credit to Wootton—all with the intention that Wootton and Capital would never pay for the purchased items.

"A civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means." *Brock v. Thompson*, 948 P.2d 279, 294 (Okla. 1997). For Capital and Raimbeault to be liable, they must have "pursue[d] an independently unlawful purpose or [have] use[d] an independently unlawful means." *Id*. In other words, "[t]here can be no civil conspiracy where the act complained of and the means employed are lawful." *Id*.

Capital's and Raimbeault's argument for dismissal is essentially that because civil conspiracies cannot arise on the basis of contract—and Ag Spray does not have a viable tort claim—the claim must be dismissed. But as explained, Ag Spray has stated a plausible

9

claim for the torts of conversion and fraudulent transfer. Defendants' motion to dismiss is therefore denied.

E. *The Claim for Breach of Guaranty against Raimbeault*

Lastly, Raimbeault has moved to dismiss the claim for breach of guaranty against him. The claim stems from Raimbeault's execution of a guaranty in favor of Ag Spray on Capital's application for business credit with Ag Spray. On that application, Raimbeault stated that he

> [H]ereby guarant[ees], absolutely and unconditionally, jointly and severally, to FIMCO the full and prompt payment of all liabilities, obligations, charges and dues of Applicant to FIMCO (the "Guaranty"). This Guaranty is an absolute, continuing and unconditional guaranty of payment (and not of collection and of performance of Applicant's obligations, and shall remain in full force and effect until the obligations and expenses in connection therewith shall be fully paid and performed.
>
> (Doc. 1, Ex. 2, at 2).

Ag Spray's theory is admittedly attenuated: as attorney in fact of Wootton, Raimbeault would have plausibly been aware of Wootton's debts to Ag Spray when he guaranteed Capital's application for credit with Ag Spray on June 8, 2016; Capital, though, is allegedly Wootton, as evidenced by Capital's holding itself out as Wootton on the credit application[6] and its owning all Wootton stock. Wootton's and Capital's obligations might therefore be one in the same, meaning that when Raimbeault guaranteed "absolutely and

---

[6] The application filled out by Capital for a line of credit with Ag Spray included several details that suggested that Capital and Wootton were one in the same. Capital's listed address is also the address of Wootton's dealership in Chickasha, Oklahoma. Capital's listed store locations, bank reference, and trade reference also match those of Wootton. Capital also represented on the June 2016 application that it had been in business for nine years, despite allegedly not having been incorporated until December 28, 2015, and not having been registered to conduct business in Oklahoma until May 9, 2016. (Doc. 1, Ex. 2).

unconditionally . . . the full and prompt payment of all liabilities, obligations, charges and dues of [Capital] to FIMCO," he was thereby guaranteeing Wootton's obligations as well. (Doc. 1, Ex. 2, at 2).

The relevant question, though, is whether Raimbeault intended to guarantee the debts of Wootton, many of which appear to have arisen before Capital took over management and ownership control. "The parties' intent in executing a guaranty contract is gathered from the entire instrument." *JPMorgan Chase Bank, N.A. v. Specialty Restaurants, Inc.* 243 P.3d 8, 12–13 (Okla. 2010). Though "extrinsic evidence need not be introduced when the language is clear and explicit," that does not seem to be the case here. *Id*. at 13. Raimbeault's guarantee reads broadly, but it also includes a possible restriction— that the guarantee "shall remain in force and effect until the obligations and expenses *in connection therewith* shall be fully paid and performed . . ." (Doc. 1, Ex. 2, at 2). Considering that the Court must take as true Ag Spray's allegation that Raimbeault was fully aware of Wootton's obligations to Ag Spray when he signed the guarantee, the question of the guarantee's scope and whether it bars this claim is better left for summary judgment or trial.

## CONCLUSION

Defendants' Motion to Dismiss is therefore denied.

IT IS SO ORDERED this 21st day of March 2017.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE